## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EILEEN KOVACH, | CASE NO. 1:13-cv-01626-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 5, 6, 11, 14 |

### I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Eileen Kovach for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). In this case, Plaintiff's primary physical impairments are lumbar spinal stenosis and rheumatoid arthritis ("RA"), which flared in her knees, hands, feet, neck, shoulders, and elbows during the relevant period. The ALJ found that Plaintiff could engage in light work. Both Plaintiff's treating physician and the state agency physician opined that Plaintiff was able to perform, at best, sedentary work. No physician opined that Plaintiff could perform light work. If Plaintiff had been limited to sedentary work, a finding of disabled would have been required. The state agency physician characterized Plaintiff's treatment, which included "long-term, high risk" medications, injections, physical therapy, braces, and multiple surgeries, as aggressive. The ALJ, who reviewed the same medical evidence as the state agency physician, concluded that Plaintiff's treatment was conservative, in part because she did not require "repeated surgical intervention." The state agency physician concluded that Plaintiff's treatment was generally not

successful, but the ALJ concluded that her treatment was effective. An ALJ is not entitled to reinterpret objective medical evidence to discount the opinion of a physician who presents competent evidence. This is particularly true where, as here, the ALJ is not choosing one opinion over another, but is instead rejecting every opinion in the record in favor of her own interpretation of medical evidence. Unlike the ALJ, the state agency physician cited to multiple treatment notes from Plaintiff's treating rheumatologist. In contrast, the ALJ ignored most of these treatment notes, and instead cited the treatment record from Plaintiff's primary care physician, who generally treated her for obesity and diabetes. Unlike the ALJ, the state agency physician specifically cited Plaintiff's long treating relationship with her rheumatologist, and found his notes to be consistent with the record. Unlike the ALJ, the state agency physician found Plaintiff's statements regarding her impairments to be fully consistent with the medical record. The ALJ does not have medical training and may not substitute her opinion for that of a physician who does have medical training. For all of the foregoing reasons, the Court will grant Plaintiff's appeal, vacate the decision of the Commissioner, and remand for further proceedings.

## II.    Procedural Background

On August 5, 2010, Plaintiff filed an application for DIB under Title II of the Act. (Tr. 142-48). On November 12, 2010, the Bureau of Disability Determination denied this application (Tr. 66-68, 71-76), and Plaintiff filed a request for a hearing on November 29, 2010.  (Tr. 77-78). On February 12, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 31-65).  On March 8, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 9-30). On April 2, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7-8), which the Appeals Council denied on April 18, 2013, thereby affirming the decision of the ALJ as the

"final decision" of the Commissioner. (Tr. 1-6).

On June 17, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On September 12, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 5, 6). On November 21, 2013, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 11). On December 19, 2013, Defendant filed a brief in response ("Def. Brief"). (Doc. 14). On April 30, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned on June 3, 2014, and an order referring the case to the undersigned was entered on June 10, 2014. (Doc. 16, 17).

### III.      Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

### IV.      Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the

Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. <u>See</u> 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on March 9, 1957 and was classified by the regulations as a person closely approaching advanced age on the date last insured and the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 34).   She has at least a high school education and past relevant work as a secretary and administrative assistant. (Tr. 23).

### Medical Records

On January 21, 2005, Plaintiff underwent a partial lateral meniscectomy and chondroplasty patella on her right knee by Dr. Rex Herbert, D.O.  (Tr. 385-386).On February 24, 2005, Plaintiff reported that she had no pain or swelling in her knee, walked without a limp, and was "pleased with her result," and discharged from Dr. Herbert's care. (Tr. 367).

On April 7, 2005, Plaintiff followed-up with Dr. David Trostle, M.D., her treating rheumatologist. (Tr. 494).  Dr. Trostle had been treating Plaintiff's RA since 2002. (Tr. 805). She reported that she had more pain in her low back and continued to have arthralgias in her hands, wrists, and right knee. (Tr. 494). She reported that her recent surgery on her right knee went well. (Tr. 494). She was taking Advil and it helped her "some." (Tr. 494). She had tenderness in the paralumbar region, hands, wrists, and right knee. (Tr. 494). She had 1+ synovitis in her hands and wrists. (Tr. 494). Dr. Trostle prescribed Celebrex, but explained that NSAID drugs can increase the risk of heart attack, stroke, blood clots and peptic ulcer disease. (Tr. 494). Dr. Trostle also prescribed physical therapy for her back, and indicated that they would consider

epidural steroids if the therapy did not help. (Tr. 494).

On April 11, 2005, Plaintiff had an MRI of her lumbar spine. (Tr. 521). She had normal alignment without subluxation and her vertebral bodies were preserved in height. (Tr. 521). She had mild to diffuse annular bulges flattening the ventral surface of the thecal sac with minimal to mild central canal stenosis, minimal bilateral foraminal narrowing, and bilateral facet hypertrophy. (Tr.521-522).

On May 16, 2005, Plaintiff followed-up with Dr. Trostle. (Tr. 493). Her back was "quite painful." (Tr. 493). She had lumbar spinal stenosis and had seen a surgeon, who opined that surgery would not "be of any benefit." (Tr. 493). Ibuprofen and Darvocet were helping "some, but not as much as she would like." (Tr. 493). She had been going to physical therapy and it was helping "some." (Tr. 493). She was using Plaquenil for her rheumatoid arthritis and had "failed Azulfidine." (Tr. 493). She continued to have arthralgias in her hands, wrists, right knee and feet. (Tr. 493). Dr. Trostle noted that she "is stiff for an hour when she gets up in the morning." (Tr. 493). She was "very tender" in both sacroiliac joints and tender in her hands, wrists, right knee, and all MTP joints. (Tr. 493).   She  had 1+ synovitis in her hands and wrists and moderate paralumbar spasm. (Tr. 493). She had pain on 5° of extension and 40° of flexion in her back. (Tr. 493). Dr. Trostle noted that Plaintiff's RA in her "right sacroiliac joint is flaring." (Tr. 493). Dr. Trostle performed an injection and noted that he would arrange for more if physical therapy did not work out. (Tr. 493). He again indicated that she was not a surgical candidate. (Tr. 493).

On June 21, 2005, Plaintiff had a consultation at the Pain Management Clinic at Hershey Medical Center. (Tr. 244). Her physical exam indicated normal strength, sensation, and reflexes and a negative straight leg raise. (Tr. 245). The examining physicians noted that she had "rheumatoid arthritis with chronic lower back pain which we think is the result of spinal

stenosis" and recommended Dr. Trostle "schedule her for lumbar epidural steroid injection at the earliest possible date." (Tr. 245). The ALJ cited to this visit. (Tr. 19). Plaintiff had the lumbar epidural steroid injection on July 6, 2005. (Tr. 243).

On July 7, 2005, Plaintiff followed-up with Dr. Trostle for her RA and reported that she was having more pain in her neck and shoulders. (Tr. 492). She was "very tender in the paracervical region and both subacromial bursas" and had mild tenderness in the paralumbar region, hands, wrists, and all MTP joints. (Tr. 492). She had mild loss of motion in the neck and shoulders and 1+ synovitis in her hands and wrists. (Tr. 492). She had moderate paracervical spasm and mild paralumbar spasm. (Tr. 492). For her rheumatoid arthritis, Dr. Trostle continued her Darvocet, Advil, and Plaquenil and ordered "x-rays of the symptomatic areas and started her in physical therapy for her neck and shoulders." (Tr. 492). He noted that she would continue with epidural steroid injections for her lower back. (Tr. 492).

On August 18, 2005, Plaintiff followed-up at the Pain Management Clinic. (Tr. 238). She reported that her lumbar epidural steroid on July 6, 2005 resulted in no improvement for the first two days and then 20-25% improvement for the next several days. (Tr. 238). She had "minimal leg pain and none of the shooting pain she had prior to the injection." (Tr. 238). She described her pain as a constant dull ache and rated her pain as 4/10, with the best as 2/10 and the worst as 8/10. (Tr. 238). Her neck and lumbar spine had full range of motion without pain or tenderness, she had normal strength with no sensory deficits, and her straight leg raise was negative. (Tr. 239).  Plaintiff had a second lumbar injection on August 30, 2005. (Tr. 236).

On September 12, 2005, Plaintiff followed-up with Dr. Trostle. (Tr. 491). He noted that "her rheumatoid disease is doing fairly well with the Darvocet, Advil and Plaquenil." (Tr. 491). Plaintiff had only mild tenderness and no definite active synovitis in her hands. (Tr. 491). Dr.

Trostle indicated that Plaintiff would be going to physical therapy. (Tr. 491).

On September 19, 2005, Plaintiff followed-up at Pain Management. (Tr. 234). She indicated that the second epidural injection had provided her with no relief, as opposed to the first injection, which provided her with some relief. (Tr. 234). She reported that her pain was worse with prolonged sitting or walking. (Tr. 234). Her musculoskeletal exam was normal except for mild tenderness and a positive modified Gaenslen maneuver. (Tr. 235). They planned for Plaintiff to have an injection into her sacroiliac joint, which was performed on October 11, 2005. (Tr. 232, 235).

On November 9, 2005, Plaintiff followed-up at Pain Management. (Tr. 234). She reported that she had received better relief from the sacroiliac injection than either of her lumbar spine injections, with about two weeks of 80% pain relief, but that her pain had escalated back tobaseline. (Tr. 230). She reported that the physical therapy, Darvocet, and NSAIDs have helped her pain. (Tr. 230). Her musculoskeletal exam was normal, except for pain on palpation in the right sacroiliac joint. (Tr. 231). Plaintiff had a second right sacroiliac joint injection on November 22, 2005. (Tr. 227, 231).

On December 12, 2005, Plaintiff followed-up with Dr. Trostle. (Tr. 490). She reported that the epidural steroids did not help her as much as she would have liked and that Darvocet, Plaquenil, and ibuprofen helped somewhat. (Tr. 490). She had mild tenderness in her shoulders and back, but no definite active synovitis in her hands. (Tr. 490). With regard to her back pain, Dr. Trostle noted that she "failed epidural steroids." (Tr. 490).

On December 28, 2005, Plaintiff followed-up at pain management. (Tr. 225). She reported that her November injection gave her 100% pain relief for two weeks and, although it began to increase thereafter, had not returned to pre-procedure levels. (Tr. 225). However,

because Plaintiff had four procedures in a row, she would not be able to have another injection until late June of 2006. (Tr. 225). Her musculoskeletal exam was normal. (Tr. 225).

On February 23, 2006, Plaintiff followed-up with Dr. Trostle. (Tr. 488-89). She was having more widespread arthralgias, stiffness, and pain, and rated her pain as an eight out of ten. (Tr. 488). Her left shoulder, both hands, and both feet were bothering her quite a bit. (Tr. 488). She complained of fatigue and poor sleep patterns because of her pain. (Tr. 488). She had 1+ synovitis in both feet and ankles. (Tr. 488). She had mild tenderness in the paralumbar region, was tender in the medial joint lines of both knees, and very tender in both subacromial bursas. (Tr. 488). She had mild loss of motion in her left shoulder and low back. (Tr. 488). She had a mild paralumbar spasm, but normal gait and station. (Tr. 488). Dr. Trostle described this as an "acute exacerbation" of her rheumatoid arthritis, particularly in the left shoulder, and he gave her an injection. (Tr. 488). Dr. Trostle noted that she was on "long-term, high risk medications" and discussed the risks of these drugs with her. (Tr. 489).

On February 23, 2006, X-rays of Plaintiff's hands indicated bilateral degenerative arthritis and periarticular osteopenia that could be consistent with early inflammatory arthritis but no definite erosions. (Tr. 518). There was little change since Plaintiff had bilateral hand X-rays on April 12, 2004. (Tr. 518). X-rays of Plaintiff's feet indicated bilateral degenerative arthritis and plantar fasciitis on the left. (Tr. 518). The plantar fascia spur had increased since her last X-rays on April 12, 2004, but there was otherwise little change. (Tr. 518).

On April 13, 2006, Plaintiff followed-up with Dr. Trostle. (Tr. 486-87). She continued to have arthralgias and stiffness, although the injection helped her shoulder "quite a bit." (Tr. 486). Her overall pain was 4/10 but her hands and wrists were doing better and "Plaquenil and ibuprofen do help her." (Tr. 486). Dr. Trostle reviewed the x-rays of her hands and feet, noting

they "showed little change from April 2004 indicating her disease modifying drugs were effective." (Tr. 486). She continued to complain of fatigue and poor sleep patterns. (Tr. 486). She had 1+ synovitis in both ankles and across al MTP joints, but good range of motion and normal gait and station. (Tr. 486). She had mild tenderness in the paralumbar region with pain on 5° of extension and 40° of flexion. (Tr. 486).  Dr. Trostle wrote that "she is disabled from her disease." (Tr. 487). On June 9, 2006, Plaintiff had an MRI of her right foot, which was unremarkable, except for a small effusion on the ankle. (Tr. 459).

On July 13, 2006, Plaintiff was referred back to Dr. Herbert for right foot pain. (Tr. 366). She indicated that she had been planting flowers and doing some gardening in February when she began having foot pain. (Tr. 365). Plaintiff has lost the use of the interosseus muscles in her feet. (Tr. 365). She had a positive Tinel's sign and interosseus weakness. (Tr. 365). Dr. Herbert assessed her with right tarsal tunnel syndrome and performed a tarsal tunnel injection. (Tr. 365).

On July 16, 2006, Plaintiff followed-up with Dr. Trostle. (Tr. 484-85). She was having more pain in her right ankle and right elbow. (Tr. 484). She was very tender in her right elbow, tender in her right ankle, and had mild tenderness in the paralumbar region. (Tr. 484). She had mild to moderate pes planus deformities and pain in the paralumbar region on 5° of extension and 40° of flexion. (Tr. 484). Dr. Trostle ordered x-rays of Plaintiff's symptomatic areas. (Tr. 485). Dr. Trostle again warned Plaintiff about her "long-term, high risk" medications. (Tr. 485). She had medial epicondyltis of the right elbow, for which Dr. Trostle prescribed an elbow band and wrist splint, and tendinitis in her right ankle, for which Dr. Trostle recommended orthotics. (Tr. 485).

On November 13, 2006, Plaintiff followed up with Dr. Trostle. (Tr. 483). Her elbow, ankle, and back were doing better, she was sleeping better, and had never gotten the orthotics.

(Tr. 483). She was tender in the right ankle and paralumbar region with pain on 5° of extension and 40° of flexion. (Tr. 483). She had mild to moderate pes planus deformities and 1+ synovitis in both feet and ankles. (Tr. 483). She still had medial epicondylitis of the right elbow. (Tr. 483).

On February 1, 2007, Plaintiff followed-up with Dr. Trostle. (Tr. 482). She was having more pain in her left knee but her elbows and ankles were doing better. (Tr. 482). He ordered x-rays and physical therapy for her left knee. (Tr. 482). She had moderate tenderness in the medial joint line of the left knee and antalgic gait and station. (Tr. 482). She had mild tenderness in the paralumbar area with pain on 10° of extension and 50° of flexion. (Tr. 482). She had mild to moderate pes planus deformities and 1+ synovitis across all of the MTP joints. (Tr. 482). An x-ray from the same day indicated mild degenerative arthritis in her left knee. (Tr. 513).

Plaintiff attended twenty physical therapy sessions for her left knee at Central Penn Rehab from March 12, 2007 to May 3, 2007. (Tr. 287-88).  Plaintiff's discharge note from May 3, 2007 indicated that she continued to have tightness, "which appears to be pulling patella laterally possibly causing some of the medial knee pain," and had bruising around her left knee from wearing her brace. (Tr. 293). However, she reported "no tenderness or pain on the lateral side of the knee. She is able to perform previous ADLs without difficulty." (Tr. 293).

On August 6, 2007, Plaintiff followed-up with Dr. Trostle. (Tr. 479). Her left thumb and midfeet were the worst areas, and they were worse than her previous visit. (Tr. 479). She complained of mild arthralgias, stiffness, and fatigue. (Tr. 479). She had normal gait and station. (Tr. 479). However, she had mild tenderness in the paralumbar area with pain on 10° of extension, mild bilateral pes planus deformities, tenderness in both midfeet, and very tender in the left first CMC joint. (Tr. 479). She had 1+ synovitis across all of the MTP joints. (Tr. 479). Dr. Trostle continued her medication and gave her Lidoderm patches for her thumb and feet. (Tr.

479). She had much less pain and stiffness in her left knee since the last injection and could do more around the house. (Tr. 479). Dr. Trostle recommended orthotics for Plaintiff's pes planus deformities and again warned her about her "long-term, high risk medications." (Tr. 479).

On August 21, 2007, Plaintiff saw Dr. Kambic for a recheck of her blood pressure. He wrote that her RA seemed to be under pretty good control. (Tr. 414).

On November 1, 2007, Plaintiff was referred back to Dr. Herbert. (Tr. 358). Plaintiff reported progressive pain at the base of her left thumb over the past several months. (Tr. 358). She reported difficulty grasping objects and that her thumb locked when she tried to move it. (Tr. 358). She had x-rays the same day that indicated "endstage osteoarthritis involving the first CMC joint of the left thumb." (Tr. 358). She had painful range of motion with crepitance and swelling. (Tr. 358). Dr. Herbert performed an injection into her thumb and indicated that surgery would be necessary if the injection did not help. (Tr. 358).

On November 5, 2007, Plaintiff followed-up with Dr. Trostle. (Tr. 478). She reported that her thumb injection helped, but "not as much as she would like." (Tr. 478). She indicated that she was going to plan for surgery after the holidays. (Tr. 478). Her thumb pain was 8/10 in severity and the rest of her pain was 2/10 in severity. (Tr. 478). She had 1+ synovitis across all of the MTP joints in her feet. (Tr. 478). She was very tender in her thumb and mildly tender in the paralumbar region with pain on 10° of extension. (Tr. 478). She had mild bilateral pes planus deformities. (Tr. 478). On January 11, 2008, Dr. Herbert performed a ligamentous reconstruction with tendon interposition on Plaintiff's left thumb. (Tr. 381-382).

On February 11, 2008, Plaintiff followed-up with Dr. Trostle. (Tr. 477). She reported that her thumb surgery went well and that her pain was doing better. (Tr. 477). She had 1+ synovitis in her hands and feet but had normal gait and station. (Tr. 477). She had mild tenderness in the

paralumbar region with pain on 10° of extension and bilateral pes planus deformities. (Tr. 477).

Plaintiff attended sixteen occupational therapy sessions for her left thumb between February 20, 2008 and March 26, 2008 (Tr. 246-286). A discharge note on April 14, 2008 indicated that Plaintiff did not reach her maximum potential at occupational therapy, and was discharged pursuant to her appointment with Dr. Herbert on March 27, 2008. (Tr. 250). She had achieved 73% of her short term goals, 39% of her long term goals, and made significant progress in range of motion, strength and functional usage. (Tr. 250). She reported that she had returned to 100% of her normal activities of daily living and homemaking activities. (Tr. 250).

On May 12, 2008, Plaintiff followed-up with Dr. Trostle. (Tr. 476). Her joint pain was unchanged, 2/10, since the last visit. (Tr. 476). She had good range of motion in the neck, thoracic spine, and hips without pain. (Tr. 476). However,  she had 1+ synovitis in her feet. (Tr. 476). She had mild tenderness in the low back with mild loss of motion. (Tr. 478). She had bilateral pes planus deformities. (Tr. 476). Dr. Trostle indicated that Plaintiff's "X-rays seem to be stable without signs of progressive erosive disease." (Tr. 476).

On July 28, 2008, Plaintiff saw Dr. Kambic. (Tr. 668). She reported that she was "feeling quite a lot of pain due to her rheumatoid arthritis" but her hypertension looked better. (Tr. 668).

On September 15, 2008, Plaintiff followed-up with Dr. Trostle. (Tr. 475). Her lower back was doing worse and she complained of moderate arthralgias in her lower back. (Tr. 475). She had 1+ synovitis in the MTP joints in the feet and bilateral pes planus deformities. (Tr. 475). She also had moderate tenderness in the paralumbar region with a positive fabere sign and pain on 5° of extension and 40° of flexion. (Tr. 475). She had good range of motion in the neck, but mild tenderness. (Tr. 475). She was very tender in the right sacroiliac joint. (Tr. 475).  Dr. Trostle noted that this was Plaintiff's "worst area" and injected her there. (Tr. 475). X-rays of Plaintiff's

lumbosacral spine and pelvis indicated mild lumbar spondylosis and evidence for muscle spasm with loss of the normal lumbar lordosis. (Tr. 512).

On December 15, 2008,  Plaintiff followed-up with Dr. Trostle. (Tr. 474). She had injured her ankle two weeks earlier and was experiencing a lot of pain, 8/10 in severity. (Tr. 474). She reported that she had much less pain and stiffness in her lower back since the injections. (Tr. 475). She had 1+ synovitis in the MTP joints in the feet, bad swelling in her left ankle, and bilateral pes planus deformities. (Tr. 474). Her left ankle was very tender. (Tr. 474). She had mild loss of motion of her low back without tenderness. (Tr. 474). The same day, X-rays of Plaintiff's right foot indicated chronic plantar fasciitis and degenerative arthritis. (Tr. 511). Dr. Trostle also prescribed physical therapy for her ankle. (Tr. 474).

Plaintiff attended seventeen physical therapy sessions for her right heel in January and February of 2009. (Tr. 327-50). Plaintiff did not reach her maximum potential and was discharged to home exercises. (Tr. 327). However, she achieved all short and long term physical therapy goals with 0/10 pain at rest and with all activities. (Tr. 327). She was able to perform stair ambulation and ambulate on all surfaces without pain. (Tr. 327). Her swelling had completely resolved and her strength was within normal limits. (Tr. 327).

On March 16, 2009, Plaintiff followed-up with Dr. Trostle. (Tr. 473). Her ankle, peripheral joint, and back pain was doing better. (Tr. 473).  She had 1+ synovitis in the MCP and PIP joints in the hands, both wrists, and MTP joints in the feet. (Tr. 473). She had bilateral pes planus deformities and tenderness in the paralumbar region with mild loss of motion there. (Tr. 473). Her exam was otherwise normal. (Tr. 473).

On July 20, 2009, Plaintiff followed-up with Dr. Trostle. (Tr. 472).  Plaintiff's pain in her right wrist and left ankle was worse than her last visit. (Tr. 472). Dr. Trostle wrote that Plaintiff's

rheumatoid arthritis was "flaring in the right wrist." (Tr. 472). She was very tender in her right wrist and tender in her left ankle, which had swelling. (Tr. 472). She had 1+ synovitis across all the MTP joints in her feet. He gave her an injection in the right wrist. (Tr. 472). He also prescribed her physical therapy and an Aircast for her ankle. (Tr. 472). X-rays of Plaintiff's right wrist showed moderate to early severe degenerative arthritis. (Tr. 510). X-rays of Plaintiff's left ankle showed chronic plantar fasciitis and very mild degenerative arthritis of the midfoot. (Tr. 509).

On August 24, 2009, Plaintiff followed-up with Dr .Trostle. (Tr. 471). She reported that her right wrist injection and Aircast had helped her quite a bit and that her peripheral joint pain was much better. (Tr. 471). She had 1+ synovitis in the hands, swelling with tenderness in the left ankle, and mild tenderness in the paracervical region. (Tr. 471). On December 17, 2009, Dr. Scott King excised a cyst on Plaintiff's left index finger. (Tr. 379-80).

On December 28, 2009, Plaintiff followed-up with Dr. Trostle. (Tr. 470). She was having more pain in her hands, wrists, feet, and neck. (Tr. 470). She had 1+ synovitis in the feet, tenderness in the paracervical region with mild loss of motion, and mild tenderness in the lower back. (Tr. 470). She had moderate bilateral pes planus deformities. (Tr. 470). Dr. Trostle increased her ibuprofen and indicated that if that did not work, they would try her on a short course of prednisone. (Tr. 470). X-rays of Plaintiff's cervical spine indicated very mild cervical spondylosis of doubtful clinical significance and evidence of muscle spasm. (Tr. 506). X-rays of Plaintiff's feet indicated chronic plantar fasciitis and mild degenerative arthritis, with little change since the last X-rays on February 11, 2008. (Tr. 507). X-rays of Plaintiff's hands indicated mild to moderate degenerative arthritis, possible scattered erosions that could be consistent with a stage I to early stage II erosive inflammatory arthritis, and little change since

the last X-rays on February 11, 2008. (Tr. 508).

On February 10, 2010, Plaintiff followed-up with Dr. Trostle. (Tr. 469). Her joint pain was unchanged, and she complained of persistent arthralgias in her neck, hands, and feet. (Tr. 469). She reported that her left index finger was much better since her surgery. She had 1+ synovitis in the MTP joints in her feet, tenderness in the paracervical region with mild loss of motion, and tenderness in her low back. (Tr. 469).

On March 8, 2010, Plaintiff followed-up with Dr. Kambic. (Tr. 661). She indicated that she was following up with Dr. Trostle for her RA. (Tr. 661). She also indicated that she had "no problems and is doing very well." (Tr. 661).

On May 27, 2010, Plaintiff followed-up with Dr. Trostle. (Tr. 467-68). She was having more pain in her right thumb and the rest of her joint pain was also a little worse. (Tr. 467). She was very tender in her thumb. (Tr. 467). She had 1+ synovitis in the feet and mild tenderness in her neck and low back with mild loss of motion there. (Tr. 467). Dr. Trostle gave her Lidoderm patches and Volatern gel for the right thumb. (Tr. 467). X-rays of Plaintiff's hands and feet showed little change from December 28, 2009. (Tr. 499-500).

On September 2, 2010, Plaintiff followed-up with Dr. Trostle. (Tr. 465). She was having more pain in her neck and continued to have pain in her thumb, along with moderate arthralgias in her hands and right heel. (Tr. 465). She was very tender in the right calcaneal bursa and tender in the paracervical region and first MCP joint. (Tr. 465). She had mild tenderness in her low back with mild loss of motion in her low back and neck. (Tr. 465). Dr. Trostle wrote that "her disease is flaring." (Tr. 465). X-rays of Plaintiff's right heel showed chronic plantar fasciitis and degenerative arthritis in the midfoot. (Tr. 498). An MRI of Plaintiff's cervical spine on September 9, 2009 indicated multilevel degenerative disc disease and spondylosis, with

straightening of the cervical alignment and nonspecific loss of the normal cervical lordosis. (Tr. 496). Specifically, Plaintiff had minimally to mildly desiccated discs with bulging, mild joint hypertrophy, and minimal to mild central canal narrowing and foraminal narrowing. (Tr. 496).

On October 8, 2010, Plaintiff followed up with Dr. Kambic. (Tr. 651). She reported that her arthritis symptoms had gotten worse since her last visit. (Tr. 651). Dr. Kambic noted that Plaintiff's symptoms were controlled on plaquenil, that she experienced pain "occasional[ly] (25% of the time)", and that it is worse with standing. (Tr. 651). She reported that she experiences sixty minutes of stiffness in the mornings and has experienced flare-ups since her last visit. (Tr. 651). She reported difficulty dressing herself and getting in and out of bed. (Tr. 653). Her feet showed a normal appearance and her fingers had a normal range of motion. (Tr. 653).

On October 15, 2010, Plaintiff followed-up with Dr. Trostle. (Tr. 562). She had a calcaneal spur that was bothering her and her back and neck pain was worse than last time. (Tr. 562). Dr. Trostle noted that she showed a significant response to Prednisone in the past. (Tr. 562). She also complained of fatigue. (Tr. 562). She was very tender in the right calcaneal bursa, tender in the paracervical and paralumbar regions, and had mild loss of motion of her neck and back. (Tr. 562). Dr. Trostle performed an injection into Plaintiff's right heel. (Tr. 562). An X-ray of Plaintiff's lumbosacral spine indicated mild lumbar spondylosis. (Tr. 722).

On October 22, 2010, Dr. Kambic removed a lesion from the side of Plaintiff's head. (Tr. 649). Plaintiff's fingers had no abnormalities. (Tr. 649).

On October 26, 2010, Plaintiff had an MRI of her pelvis. (Tr. 725). It indicated an incidental sacral nerve sheath cyst on the left, but was otherwise unremarkable. (Tr. 725). An MRI of her lumbar spine mild degenerative disc disease with mild to diffuse bulges, mild facet

hypertrophy, mild central canal compromise and mild bilateral foraminal stenosis. (Tr. 726).

On December 13, 2010, Plaintiff followed-up with Dr. Trostle. (Tr. 729). She still had a calcaneal spur. (Tr. 729). She reported that the injection had helped her for about a month, but that her pain had returned. (Tr. 729). Her back and neck pain were unchanged, and all of her pain was rated as an 8/10. (Tr. 729). She reported that prednisone helps her. (Tr. 729). She complained of fatigue. (Tr. 729). On exam, she was tender, especially in her right heel. (Tr. 729). Dr. Trostle again performed an injection into her right heel. (Tr. 729).

On March 14, 2011, Plaintiff followed-up with Dr. Trostle. (Tr. 731). She had a calcaneal spur and, although the injection had helped her pain, it had returned again. (Tr. 731). She was very tender, and Dr. Trostle injected her heel and prescribed her physical therapy. (Tr. 731). On April 28, 2011, Plaintiff followed-up with Dr. Trostle. (Tr. 799). Her calcaneal spur and elbow were better, but she was having more pain in her right shoulder. (Tr. 799). She was tender, had synovitis, and "lacked 20 degrees on a sleeper sign." (Tr. 799). Dr. Trostle injected her shoulder. (Tr. 799).

**Opinion Evidence**

On October 21, 2010, Dr. Paul Fox, M.D. a state agency physician, reviewed Plaintiff's medical records and completed a physical RFC assessment. (Tr.578-584). He indicated that Plaintiff's primary diagnosis was rheumatoid arthritis, her secondary diagnosis was degenerative disc disease, and her other alleged impairments were plantar fasciitis, diabetes, obesity, and hypertension. (Tr. 578). He opined that Plaintiff could only occasionally lift up to ten pounds and could "only lift significantly less than 10 pounds on a frequent basis." (Tr. 579).  He opined that Plaintiff can sit for up to six hours in an eight hour workday and "is limited to standing and walking for two hours." (Tr. 579). He opined that she could only occasionally climb rams and

stairs, balance, stoop, or crouch, but that she could never climb ladders, ropes, or scaffolds, kneel, or crawl. (Tr. 580). He opined that she could frequently perform handling with both hands and could occasionally perform activities involving fingering with her right hand. (Tr. 580).

Dr. Fox cited to Plaintiff's surgeries on January 21, 2005, October 20, 2006, and January 11, 2008. (Tr. 583). He also cited to Plaintiff's visits with Dr. Trostle on February 1, 2007, September 15, 2008, July 20, 2009, December 28, 2009, and May 27, 2010, September 2, 2010, and October 15, 2010. (Tr. 583-84). He noted that these visits revealed pain and tenderness that were worse with activity, antalgic gait, synovitis, loss of range of motion. (Tr. 583-84). He observed that, as of February 1, 2007, Dr. Trostle had been "managing [Plaintiff's] rheumatoid arthritis for a number of years." (Tr. 583). Dr. Fox also cited to the x-rays of Plaintiff's hands that showed moderate degenerative arthritis and inflammatory arthritis, the MRI of Plaintiff's cervical spine that showed multilevel degenerative disc disease, and x-rays of her lumbar spine that showed mild narrowing of the lumbosacral joint and facet joints. (Tr. 583-84). Dr. Fox noted that Plaintiff "has described activities that are significantly limited" which was "consistent with the limitations indicated by other evidence in this case." (Tr. 584). He continued:

> The medical evidence shows that despite ongoing treatment, she continues to have pain which significant impacts on her ability to perform work related activities. Furthermore, she has aggressively pursued treatment for her Rheumatoid Arthritis. She has received various forms of treatment for the alleged symptoms. The record reveals that the treatment has generally not been successful in controlling those symptoms.

(Tr. 584). Dr. Fox concluded that Plaintiff's "statements are found fully credible." (Tr. 584).

On January 6, 2012, Dr. Trostle submitted an opinion letter. (Tr. 805). He explained that he was a rheumatologist who had been treating Plaintiff every three months for ten years. (Tr. 805). He cited her rheumatoid arthritis, multiple surgeries and physical therapy. (Tr. 805). He explained that she had bilateral hand swelling and constant pain. (Tr. 805). He opined that

Plaintiff could only walk for two hours out of an eight hour day. (Tr. 805). He also opined that she would need unscheduled breaks every two hours for thirty minutes and was likely to be absent from work more than three days per month. (Tr. 805).

### Function Report, Testimony, and ALJ Findings

On September 5, 2010, Plaintiff completed a Function Report. (Tr. 173). She reported that she has "much difficulty" sleeping because every time she moves, her pain wakes her. She indicate difficulties with her personal care, including dressing, bathing, shaving, caring for her hair, feeding herself, and using the toilet. (Tr. 174). She reported that cooking used to be one of her favorite things to do, but she was no longer to prepare meals beyond fruit, cereal or sandwiches without her family's help. (Tr. 175). She explained that her back and neck pain prevented her from standing for any length of time and that hand pain prevented her from cutting, pealing or paring foods. (Tr. 175). She reported that she was only able to some chores, like dusting, cleaning the bathroom counters, and putting clothes in the washer and dryer, a few minutes at a time when her pain level permits. (Tr. 175). She reported that she needed help to fold laundry, vacuum, clean tubs, sinks, and toilets, change sheets, scrub floors, make dinner, clean the kitchen, and put the dishes away. (Tr. 175). She reported that she was unable to do yard work or pull weeds. (Tr. 176). She reported that she shops for groceries, medicine and toiletries about twice a month for no more than an hour. (Tr. 176).  She reported that she was only able to occasionally watch television or read depending on her neck pain, and that she was unable to do any activity for any length of time. (Tr. 177). She reported that she was unable to do any social activity that was longer than an hour because of her pain. (Tr. 178). She reported that she could walk no more than a block or two before needing to stop and rest for several minutes and that she could only pay attention for fifteen minutes before her pain distracted. (Tr. 177). She reported

that she has an extreme amount of pain in her neck, low back, thumb, knees, toes, right foot, and shoulders when she wakes in the morning and, although she may loosen up occasionally, it gets consistently worse as the day progresses. (Tr. 181). She reported that her medications only "take the edge off the pain for a short while." (Tr. 182). She reported that her pain medications cause her fatigue. (Tr. 182).

On February 13, 2012, Plaintiff appeared and testified at the ALJ hearing. (Tr. 31). She testified that she was right-handed. (Tr. 36). She testified that she can only relieve her pain by lying on the floor for twenty minutes, which she has to do several times per day. (Tr. 45). She testified that she cannot use the computer or read for any length of time because of her neck pain (Tr. 46). She testified that it takes her an hour and half after she wakes up to get her joints moving. (Tr. 47). Then, she "move[s] around a little bit" and does a little bit around the house, but no heavy cleaning. (Tr. 47). She testified that she lays down from noon to one p.m., then moves around a little more, has lunch, and spends more time on the floor. (Tr. 48). She testified that she has dinner with her daughter and husband, and her daughter cleans up the kitchen. (Tr. 48). She testified that she spends her evening with them watching television and then goes to bed. (Tr. 48-49). She testified that her hands swell on a daily basis. (Tr. 49). She testified that she had so many problems ambulating up and down stairs, she sold her two-story home and moved into a single story home. (Tr. 50). She testified that she can stand for about fifteen minutes at a time and walk for about ten minutes at time. (Tr. 50). She testified that she could not lift more than ten pounds. (Tr. 50).

The vocational expert also appeared and testified. (Tr. 53). She testified that, given the RFC assessed by the ALJ as described below, Plaintiff would not be able to perform her past relevant work, but would be able to perform other work in the national economy, such as a

bakery surveyor worker, machine tender laminating, and a photo finishing counter clerk. (Tr. 53-61). When the attorney attempted to question the VE, the ALJ refused to let him proceed with his questions unless he defined them in terms of "vocational factors." (Tr. 64). However, the VE did testify that, if Plaintiff was to miss three or more days of work per month, there would be no work in the national economy she could perform. (Tr. 64)

The ALJ issued a decision on March 8, 2012. (Tr. 12). At step one, she found that Plaintiff was insured through December 31, 2010 and had not engaged in substantial activity since her alleged onset date of June 18, 2005. (Tr. 14). At step two, she found that Plaintiff's rheumatoid arthritis, degenerative disc disease with stenosis, plantar fasciitis, diabetes, obesity, and hypertension were medically determinable severe impairments. (Tr. 14). The ALJ found that Plaintiff's mental impairments were not severe. (Tr. 14). At step three, the ALJ found that Plaintiff's impairments did not meet or equal a Listing. (Tr. 15).  The ALJ found that Plaintiff had the RFC to engage in light work except that she can only occasionally climb stairs, balance, stoop, crouch, squat, reach overhead and handle with the right upper extremity. (Tr. 16). The ALJ also found that Plaintiff was precluded from climbing ropes, ladders, scaffolding, or poles, kneeling, crawling, being exposed to extreme cold and extreme humidity, concentrated exposure to wetness/water/liquids, working around or with vibrating objects or surfaces, working in high exposed places, around fast moving machines on the ground, around or with sharp objects, and around or with toxic or caustic chemicals. (Tr. 16). She also required a sit/stand at will option. (Tr. 16). The ALJ found that Plaintiff could not perform her past relevant work, but could perform the other work in the national economy identified by the vocational expert. (Tr. 23-24). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 25).

### VI.    Plaintiff Allegations of Error

### A.      The ALJ's assignment of limited weight to every physical medical opinion

Plaintiff asserts that the ALJ erred in failing to credit the opinions of Dr. Trostle and Dr. Fox, the state agency physician, that she could not engage in light work. Dr. Trostle was Plaintiff's treating physician. The Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R.  § 416.927(d)(2).

When a treating physician's opinion is not given controlling weight,  20 C.F.R.  § 416.927 establishes the factors an ALJ should weigh in assigning weight to opinions by treating physicians and other medical source opinion evidence. Under 20 C.F.R. §§404.1527(c)(1) and (2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians. 20 C.F.R. §404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship.  20 C.F.R. §404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §404.1527(c)(5) provides more weight to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

Although it is clearly within the ALJ's statutory authority to choose whom to credit when witnesses give conflicting testimony, the ALJ "cannot reject evidence for no reason or the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993) (quoting Cotter v. Harris, 642 F.2d 700, 707 (3d Cir.1981)). "[A]n ALJ is not free to set his [or her]  own expertise against that of a physician who presents competent evidence." Ferguson v. Schweiker, 765 F.2d 31, 37 (3d

Cir. 1985). An ALJ impermissibly substitutes her "own judgment for that of a physician" when she independently reviews and interprets the objective medical evidence. Id. An ALJ may point to inconsistencies between the physician's opinion and treatment record to credit one opinion over another, Plummer v. Apfel, 186 F.3d 422, 430 (3d Cir. 1999), but only if the treatment notes address ability to function in a work setting. Brownawell v. Comm'r Of Soc. Sec., 554 F.3d 352, 356 (3d Cir. 2008). An ALJ may not rely on indications in the record that a claimant's conditions are "'stable and well controlled with medication' during treatment" to reject medical source opinions. Brownawell, 554 F.3d at 356 (quoting Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000)). An ALJ also may not reject a medical source opinion "due to his or her own credibility judgments." Morales, 225 F.3d at 317.

Here, the ALJ rejected Dr. Trostle's and Dr. Fox's opinions. The ALJ rejected Dr. Fox's opinion because "it is not supported by the totality of the evidence of record including the relatively benign clinical and laboratory findings and the limited degree of treatment required." (Tr. 23). The ALJ rejected Dr. Trostle's opinion because it was "not supported by the relatively benign clinical findings or the limited degree of treatment required" and  because it did not "clearly relate back to the period at issue." (Tr. 23).

Although the ALJ may use a lack of objective findings or conservative treatment to assess a claimant's credibility, SSR 96-7p, an ALJ may not use credibility determinations to weigh medical evidence. Morales, 225 F.3d at 317. Moreover, an ALJ may not reinterpret medical evidence to reject opinions by doctors who have medical training. This  is  not  a  case where the ALJ chose one medical opinion over another. Instead, the ALJ rejected all of the medical opinions in favor of her own. In discussing the medical opinions, the ALJ did not cite to the record whatsoever. However, in her earlier summary of the evidence, she acknowledged

multiple objective findings, such as bilateral degenerative arthritis in the hands, evidence consistent with inflammatory arthritis in the hands, stiffness, arthralgias, synovitis, bilateral pes planus deformities, chronic plantar fasciitis, early severe degenerative arthritis of the right wrist, lumbar spondylosis, loss of motion, multilevel degenerative disc disease, facet hypertrophy with central canal and foraminal stenosis. (Tr. 19-22). Dr. Trostle and Dr. Fox both opined that, given those findings, Plaintiff could not engage in light work.

Because the ALJ, Dr. Trostle, and Dr. Fox had the same information available to them, her conclusion that Plaintiff could engage in light work constitutes reinterpreting the objective evidence. Dr. Fox reviewed the records cited by the ALJ that purportedly contradict his opinion. Obviously, Dr. Fox, who has medical training, concluded that Dr. Kambic's treatment notes did not support a finding that Plaintiff could engage in light work. The ALJ, who does not have medical training, concluded that Dr. Kambic's treatment notes did support a finding that Plaintiff could engage in light work.

Dr. Fox, who has medical training, concluded that Plaintiff's treatment was "aggressive" and had "not been successful," while the ALJ, who does not have medical training, concluded that Plaintiff's treatment was "conservative" and "effective." Specifically, Dr. Fox reviewed Plaintiff's medical record and concluded that "[t]he medical evidence shows that despite ongoing treatment, [Plaintiff] continues to have pain which significantly impacts on her ability to perform work related activities." (Tr. 584). Dr. Fox also characterized Plaintiff's course of treatment, noting that "she has aggressively pursued treatment for her Rheumatoid Athritis" and "has received various forms of treatment for the alleged symptoms." (Tr 584). Dr. Fox concluded that "[t]he record reveals that the treatment has generally not been successful in controlling these symptoms." (Tr. 584).

In contrast, the ALJ characterized Plaintiff's course of treatment as "limited." (Tr. 22). She wrote that Plaintiff's treatment was "essentially conservative in nature" because she "did not require repeated surgical intervention, inpatient hospitalization, partial hospitalization, or frequent/repeated emergency room visits." (Tr. 19). She also concluded that the treatment has been successful, explaining that "it is reasonable to conclude that treatment is effective in light of the fact that no alternative treatment has been sought or recommended." (Tr. 22). To the extent that such an inference is "reasonable" generally, it is not reasonable given the opinion of an expert with medical training that Plaintiff's treatment has "not been successful." (Tr. 584) The only explanation for this is that the ALJ reinterpreted objective medical evidence to reject every medical opinion on the record. This is impermissible. Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985).

This error is compounded here, where the ALJ cherry-picked objective findings in the record that supported her opinion and ignored those that contradicted her opinion. Generally, the ALJ cited to reports by Dr. Kambic, who did not treat Plaintiff's rheumatoid arthritis or musculoskeletal pain, while ignoring reports by Dr. Trostle and Dr. Herbert, who did treat Plaintiff's rheumatoid arthritis or musculoskeletal pain. The ALJ largely cited to exams performed by Dr. Trostle that had fairly normal findings, and ignored those that had significant objective findings. The ALJ regularly cited to x-rays from the same date as Dr. Trostle's examinations, but not the examinations themselves.

The ALJ cited to Plaintiff's post-operative follow-up in February 24, 2005 with Dr. Herbert where she reported she was pleased with her surgery, but did not cite to Plaintiff's April 7, 2005 or May 16, 2005 visits with Dr. Trostle, when she reported pain in her low back,

arthralgias in her hands, wrists, and right knee, and physical exam revealed tenderness, synovitis, stiffness, and moderate paralumbar muscle spasm. (Tr. 19, 367, 493-94). During these visits, Dr. Trostle prescribed physical therapy and performed an injection to Plaintiff's sacroiliac joints, and he specifically wrote that her "right sacroiliac joint is flaring." (Tr. 494-93). The ALJ cited to pain management consultation notes with largely normal physical exams on June 21, 2005 and August 18, 2005, but did not cite Plaintiff's July 7, 2005 intervening follow-up with Dr. Trostle, when her physical exam revealed severe tenderness, loss of motion, synovitis, and moderate muscle spasm. (Tr. 19, 238, 243, 492). Similarly, although the ALJ cited the August 18, 2005 visit, she cited only the positive findings, and failed to acknowledge that Plaintiff reported only 20-25% improvement with her injection.

The ALJ cited to Plaintiff's visit with Dr. Trostle on September 12, 2005 and December 12, 2005, which were the only visits on which she had no synovitis. (Tr. 19, 490-91). The ALJ did not cite to Plaintiff's visit with Dr. Trostle on February 23, 2006, when she had widespread arthralgias, stiffness, and pain, rated her pain as an eight out of ten, complained of fatigue and poor sleep patterns because of her pain, had 1+ synovitis in both feet and ankles, tenderness, loss of motion, and muscle spasm.  (Tr. 488). Dr. Trostle described this as an "acute exacerbation" of her rheumatoid arthritis, particularly in the left shoulder and gave her an injection. (Tr. 488). The ALJ cited to Plaintiff's April 13, 2006 visit with Dr. Trostle, but only cited the normal examination findings, and did not mention that it indicated tenderness, fatigue, poor sleep, or that her medications were "long-term, high risk." (Tr. 20, 486-87). The ALJ cited to pain management visits on November 9, 2005 and December 28, 2005. (Tr. 19). However, for the November 9 visit, the ALJ wrote only that Plaintiff's pain medications helped her pain, and did not acknowledge that she reported her pain had returned to baseline. (Tr. 19, 231).

The ALJ cited to Plaintiff's July 13, 2006 visit with Dr. Herbert, but only to note that Plaintiff had been doing some gardening. (Tr. 20). She failed to acknowledge that Plaintiff had lost the use of the interosseus muscles in her feet, had a positive Tinel's sign, interosseus weakness, and right tarsal tunnel syndrome or that Dr. Herbert performed a tarsal tunnel injection. (Tr. 365).

The ALJ did not cite to visits with Dr. Trostle from July 16, 2006, November 13, 2006, or February 1, 2007, when findings on exam included pain in her right ankle and right elbow, severe tenderness, mild to moderate pes planus deformities, pain in the paralumbar region on 5° of extension and 40° of flexion, medial epicondyltis of the right elbow, tendinitis in her right ankle, synovitis in both feet and ankles, and antalgic gait and station. (Tr. 482-85). At each of these visits, Dr. Trostle warned her about "long-term, high risk medications." (Tr. 482-85). Curiously, the ALJ did cite an X-ray from February 1, 2007, which indicated mild degenerative arthritis in her left knee. (Tr. 20, 513).

The ALJ cited to a visit that Plaintiff had with Dr. Kambic for a re-check of her blood pressure, on August 21, 2007, when he wrote that her RA seemed to be under pretty good control. (Tr. 20, 414). She did not cite to notes from a November 1, 2007 visit with Dr. Herbert or August 6, 2007 and November 5, 2007 visits with Dr. Trostle, who were actually treating Plaintiff's RA. (Tr. 20, 414). These visits indicated that Plaintiff's left thumb and midfeet were the worst areas, and they were worse than her previous visit, mild arthralgias, stiffness, fatigue, severe tenderness, bilateral pes planus deformities, synovitis, difficulty grasping objects, x-rays that indicated "endstage osteoarthritis involving the first CMC joint of the left thumb," and painful range of motion with crepitance and swelling. (Tr. 358, 478-79). The ALJ did not cite to the injection performed by Dr. Herbert on November 1, 2007. (Tr. 358). The ALJ also did not

cite to Plaintiff's surgery on January 11, 2008 when Dr. Herbert performed a ligamentous reconstruction with tendon interposition on Plaintiff's left thumb. (Tr. 381-382).

The ALJ cited to visits with Dr. Trostle on February 11, 2008 and May 12, 2008. (Tr. 20). Both of these visits indicated synovitis. (Tr. 476-77). However, the ALJ did not acknowledge that she had synovitis in her hands and feet for the February 11, 2008 visit and specifically wrote that she had no synovitis for her May 12, 2008 visit. (Tr. 20). The ALJ cited to Plaintiff's July 28, 2008 visit with Dr. Kambic. but only the portion that indicated her hypertension was looking better. (Tr. 21, 668). The ALJ did not acknowledge Plaintiff was also "feeling quite a lot of pain due to her rheumatoid arthritis." (Tr. 668).

The ALJ cited to X-rays from September 15, 2008, but noted only the mild lumbar spondylosis, not the evidence of muscle spasm with loss of normal lumbar lordosis. (Tr. 21, 512). She did not cite to Dr. Trostle's examination the same day, which indicated that her lower back was doing worse, synovitis in the MTP joints in the feet, bilateral pes planus deformities, moderate tenderness, a positive fabere sign, and severe tenderness in the right sacroiliac joint, where Dr. Trostle performed an injection. (Tr. 475). Similarly, the ALJ cited to X-rays from December 15, 2008, but not Dr. Trostle's examination the same day, which indicated severe pain in her ankle, synovitis in the MTP joints in the feet, bad swelling in her left ankle, bilateral pes planus deformities, and mild loss of motion of her low back. (Tr. 20, 474, 511).

The ALJ cited to Plaintiff's March 16, 2009 visit with Dr. Trostle,  but did not acknowledge the synovitis, tenderness, loss of motion, or pes planus deformities, writing that Plaintiff "complained only of mild arthralgias." (Tr. 21, 473). The ALJ cited to X-rays on July 20, 2009, but not Dr. Trostle's examination the same day, which indicated that Plaintiff's rheumatoid arthritis was "flaring in the right wrist," swelling in her left ankle, synovitis across all

the MTP joints in her feet, that her medications were "long-term, high risk," and that Dr. Trostle performed an injection into her right wrist.  (Tr. 21, 472, 509-10).

The ALJ cited to Plaintiff's August 24, 2009 visit with Dr. Trostle, but did not acknowledge the synovitis, swelling, or tenderness. (Tr. 21, 471). The ALJ cited to X-rays on December 28, 2009, did not acknowledge that the cervical spine imaging revealed evidence of muscle spasm. (Tr. 21, 506). She did not cite Dr. Trostle's exam from the same day, when Plaintiff had more pain in her hands, wrists, feet, and neck, synovitis in the feet, tenderness in the paracervical region with mild loss of motion, and moderate bilateral pes planus deformities. (Tr. 470).

The ALJ did not cite to Dr. Trostle's February 10, 2010 or May 27, 2010 notes that indicated persistent arthralgias in her neck, hands, and feet, synovitis in the MTP joints in her feet, tenderness in the paracervical region with mild loss of motion, tenderness in her low back, and more pain in her right thumb. (Tr. 467-69). Curiously, the ALJ did cite to a note from Dr. Kambic from March 8, 2010, who was not treating Plaintiff's rheumatoid arthritis, which indicated she had  "no problems and is doing very well." (Tr. 21, 661).  Similarly, the ALJ cited to Dr. Kambic's October 8, 2010 note and his October 22, 2010 removal of a lesion from Plaintiff's head. (Tr. 22). In contrast, she cited to Dr. Trostle's October 15, 2010 but only the portion that indicated a significant response to Prednisone. (Tr. 22). She did not acknowledge the calcaneal spur, tenderness, loss of motion, or injection. (Tr. 22, 562). Similarly, the ALJ cited to Dr. Trostle's December 13, 2010 note, , but only the portion that indicated prednisone helps. (Tr. 22). She did not acknowledge Plaintiff's continued complaints of pain, Dr. Trostle's findings on examination, or the injection. (Tr. 22).

Plaintiff attended fifty-three sessions of physical therapy in three courses between March 12, 2007 and May 3, 2007, February 20, 2008 to March 26, 2008, and January 12, 2009 to February 25, 2009. (Tr. 246-48, 287-88, 327-50). The ALJ cited to the discharge summaries from these courses, but not the length or frequency of sessions. (Tr. 19-22). Averaged out over the period from March 12, 2007 to February 25, 2009, these sessions would result in more than two absences per month.

The ALJ's characterization of the evidence suggests a pattern of citing to exams when the physical examination findings support her decision while ignoring exams when the physical examination findings contradict her decision. This violates Third Circuit precedent:

> [W]e need from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.

Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). Moreover, citing notes that Plaintiff's rheumatoid arthritis is stable or well-controlled to reject medical source opinions directly violates Third Circuit precedent. Brownawell, 554 F.3d at 356.

Plaintiff argues that Dr. Trostle's opinion relates back to the relevant period because her condition has not worsened, while Defendant argues that it does not relate back because her condition has worsened. The ALJ simply wrote that Dr. Trostle's opinion "does not clearly relate back to the period at issue." (Tr. 23). However, just because the opinion was issued after the date last insured does not mean that it does not relate to the relevant period. Jackson v. Sec'y of Health & Human Servs., CIV.A. 85-7369, 1986 WL 10807 at * 2 (E.D. Pa. Sept. 30, 1986)("Given the language of [a treating source opinion] its proximity to the termination of her insured status, and [claimant's] history of neck and back pain, it is reasonable to assume this condition affected the claimant before her insured status expired."); Meek v. Astrue, 308-CV-

317-J-HTS, 2008 WL 4328227 at *2  (M.D. Fla. Sept. 17, 2008)("[T]he ALJ should consider evidence from a physician discussing the severity of an ongoing impairment or offering an opinion as to a claimant's condition prior to the date last insured.") (citing Cooper v. Comm'r of Soc. Sec., 277 F.Supp.2d 748, 754 (E.D.Mich.2003) ("Medical evidence that postdates the insured status date may be, and ought to be, considered, but only insofar as it bears on the claimant's condition prior to the expiration of insured status.")).Here, the Court agrees that the treatment notes from Dr. Trostle prior to the date last insured appear consistent with the treatment notes from Dr. Trostle after the date last insured. The ALJ is not required to find that Dr. Trostle's opinion relates back to the relevant period, but, given Dr. Trostle's long treating relationship and the consistency in his notes from before and after the date last insured, the ALJ needs to provide specific, legitimate reasons for discounting his opinions.  The ALJ refused to even acknowledge Dr. Trostle's notes from after the date last insured, so there is no way of knowing whether she actually evaluated them for this purpose. Cotter, 642 F.2d at 705.

Defendant points out that it is the ALJ's duty to resolve conflicts in the evidence, but there was no conflict in the evidence here. (Def. Brief at 33). Dr. Trostle and Dr. Fox's opinions were consistent with each other and with the medical record. The only conflict was between the ALJ's decision and the opinions of all of the doctors who examined Plaintiff's physical impairments. Defendant relies on inconsistencies with Plaintiff's testimony and the observations of Dr. Kambic, but he did not treat Plaintiff for her rheumatoid arthritis or her lumbar spinal stenosis and back pain. (Def. Brief at 31).  This alone is insufficient to create a "conflict" that allows the ALJ to substitute her medical opinion for that of doctors who both presented competent medical evidence.  Defendant also points out that an ALJ does not need to give controlling weight to opinions that are not well-supported or inconsistent with other substantial

evidence of record. This does not address Plaintiff's contention, however, that even when not controlling, an ALJ is not entitled to reject the medical opinions of every physician who addressed Plaintiff's physical impairments. Defendant contends that Dr. Trostle "made little or no effort to support these statements with examination findings or diagnostic studies," but that ignores more than a dozen diagnostic studies contained in his treatment notes and many examination findings documented in his decade-long treating relationship with Plaintiff. (Def. Brief at 35). Defendant contends that Dr. Trostle's opinion was inconsistent with objective finding but this constitutes the same error made by the ALJ: reinterpreting objective medical evidence to discount an opinion. (Def. Brief at 35).

With regard to Dr. Fox, Defendant asserts that the ALJ properly found that Plaintiff's objective findings were benign and treatment was conservative, pointing to Dr. Kambic's notes and the frequency with which she saw Dr. Trostle. (Def. Brief at 36). This ignores the fact that Dr. Fox had this information before him, and still concluded that Plaintiff was unable to engage in light work. Defendant also asserts that it was not error for the ALJ to conclude that Plaintiff had not required surgeries, because those surgeries were successful. (Def. Brief at 39). The success of those surgeries is not relevant. The ALJ used an absence of surgeries to conclude that Plaintiff's treatment was conservative, not to address the severity of the underlying impairment. The ALJ heavily relied on Plaintiff's purported conservative treatment in rejecting her testimony and the opinions of Dr. Fox and Dr. Trostle, all of which support her claims that she cannot engage in light work. Defendant has simply failed to identify any basis for this Court to conclude anything other than that the ALJ, who reviewed the same evidence as Dr. Fox, impermissibly reinterpreted objective medical evidence to reject Dr. Fox's opinion. No reasonable person would have accepted this evidence as adequate to reject Dr. Fox's or Dr. Trostle's opinions, so

the ALJ's assignment of weight and RFC assessment lacks substantial evidence.

### B.      The ALJ's credibility determination

If the opinions of Dr. Trostle or Dr. Fox were credited, Plaintiff's testimony would be "supported by competent medical evidence." Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979). When testimony of subjective symptoms is supported by competent medical evidence, they are entitled to "great weight." Id. Because the ALJ failed to properly evaluate the opinions of Dr. Trostle and Dr. Fox, the Court cannot determine whether Plaintiff's subjective complaints were entitled to great weight. Consequently, the ALJ's credibility determination also lacks substantial evidence.

### VIII.     Conclusion

Therefore, the Court finds that the decision of the ALJ lacks substantial evidence. Pursuant to 42 U.S.C. §§ 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.


Dated: September 26, 2014                                 s/Gerald B. Cohn
                                                                    GERALD B. COHN
                                                       UNITED STATES MAGISTRATE JUDGE